**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT F. KENNEDY, Jr., a citizen of New York; JOSEPH MERCOLA, MD, a citizen of Florida; RONALD CUMMINS, a citizen of Minnesota; CHELSEA GREEN PUBLISHING, INC., a Vermont corporation, *Plaintiffs-Appellants,* <br><br> v. <br><br> ELIZABETH WARREN, Senator, United States of America, in official and in personal capacity, *Defendant-Appellee.* | No. 22-35457 <br><br> D.C. No. 2:21-cv-01508-BJR <br><br> OPINION |

Appeal from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, District Judge, Presiding

Argued and Submitted January 9, 2023
Pasadena, California

Filed May 4, 2023

Before:  Paul J. Watford, Michelle T. Friedland, and Mark
J. Bennett, Circuit Judges.

Opinion by Judge Watford;
Concurrence by Judge Bennett

## SUMMARY[*]

### Standing / Preliminary Injunction / First Amendment

The panel affirmed the district court's order denying plaintiffs' request for a preliminary injunction that challenged a letter sent by Senator Elizabeth Warren to Amazon's Chief Executive Officer requesting that the online retailer modify its algorithms so that they would no longer direct consumers to plaintiffs' book titled *The Truth About COVID-19: Exposing the Great Reset, Lockdowns, Vaccine Passports, and the New Normal*.

Plaintiffs sued Senator Warren, alleging that her letter violated their First Amendment rights by attempting to intimidate Amazon and other booksellers into suppressing their publication. They sought a preliminary injunction requiring Senator Warren to remove the letter from her website, to issue a public retraction, and to refrain from sending similar letters in the future. The district court concluded that plaintiffs failed to raise a serious First Amendment question and that the equitable considerations did not weigh in their favor.

The panel first considered whether the plaintiffs had standing to seek a preliminary injunction. The panel held

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that the alleged reputational harm to plaintiffs provided a sufficient basis for standing. Senator Warren's letter disparaged the book by claiming that the book perpetuated dangerous falsehoods that have led to countless deaths. It also directly impugned the professional integrity of one of the authors. The plaintiffs have shown that these remarks, which Senator Warren broadcast to the public by posting the letter on her website, damaged their reputations. Reputational harm stemming from an unretracted government action is a sufficiently concrete injury for standing purposes. In addition, the panel held that the requested preliminary injunction would likely redress the plaintiffs' reputational injuries.

Turning to the merits, the panel held that because the plaintiffs did not raise a serious question on the merits of their First Amendment claim, the district court did not abuse its discretion by denying a preliminary injunction. The crux of plaintiffs' case was that Senator Warren engaged in conduct prohibited under *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), by attempting to coerce Amazon into stifling their protected speech. Following *Bantam Books*, lower courts have drawn a sharp line wherein a government official's attempt to persuade is permissible government speech, while an attempt to coerce is unlawful government censorship.

The panel applied a four-factor framework, formulated by the Second Circuit, and agreed with the district court that Senator Warren's letter did not cross the constitutional line between persuasion and coercion. First, concerning the government official's word choice and tone, the panel held that Senator Warren's words on the page and the tone of the interaction suggested that the letter was intended and received as nothing more than an attempt to

persuade. Second, concerning whether the official had regulatory authority over the conduct at issue, the panel held that this factor weighed against finding impermissible coercion. Elizabeth Warren, as a single Senator, had no unilateral power to penalize Amazon for promoting the book. This absence of authority influenced how a reasonable person would read her letter. Third, concerning whether the recipient perceived the message as a threat, the panel held that there was no evidence that Amazon changed its algorithms in response to Senator Warren's letter, let alone that it felt compelled to do so. Fourth, concerning whether the communication referred to any adverse consequences if the recipient refused to comply, the panel held that Senator Warren's silence on adverse consequences supported the view that she sought to pressure Amazon by calling attention to an important issue and mobilizing public sentiment, not by leveling threats. Senator Warren never hinted that she would take specific action to investigate or prosecute Amazon.

The panel concluded that the plaintiffs had not raised a serious question as to whether Senator Warren's letter constituted an unlawful threat in violation of the First Amendment. Accordingly, the panel held that the district court did not abuse its discretion in denying the plaintiffs' request for a preliminary injunction.

Judge Bennett concurred in the judgment because the district court did not misapply the law, clearly misconstrue the record, or otherwise abuse its discretion in determining that plaintiffs were unlikely to succeed on the merits on their First Amendment claim. He disagreed with the majority's holding that plaintiffs failed even to raise a "serious question" going to the merits regarding Senator Warren's letter. He wrote separately to express his view that some

aspects of Senator Warren's letter could be interpreted as coercive by a reasonable reader.  Nevertheless, the district court correctly determined that these coercive elements were not sufficient to demonstrate the "likelihood of success on the merits" necessary for a preliminary injunction.

## COUNSEL

Jed Rubenfeld (argued), New Haven, Connecticut; Nathan J. Arnold and R. Bruce Johnson, Arnold & Jacobowitz PLLC, Redmond, Washington; for Plaintiffs-Appellants.

Sarah J. Clark (argued) and Michael S. Raab, Appellate Staff Attorneys; Nicholas W. Brown, United States Attorney; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice; Washington, D.C.; William B. Stafford (argued) and Lindsay McAleer, Elias Law Group LLP, Seattle, Washington; Elisabeth C. Frost and Melinda K. Johnson, Elias Law Group LLP, Washington, D.C.; for Defendant-Appellee.

**OPINION**

WATFORD, Circuit Judge:

The plaintiffs in this case are the authors and publisher of a book titled *The Truth About COVID-19: Exposing the Great Reset, Lockdowns, Vaccine Passports, and the New Normal*. They argue that Senator Elizabeth Warren crossed a constitutional line dividing persuasion from intimidation when she sent a letter to Amazon requesting that the online retailer modify its algorithms so that they would no longer direct consumers to the plaintiffs' book. We conclude that Senator Warren's letter falls safely on the persuasion side of the line and accordingly hold that the district court did not abuse its discretion by denying the plaintiffs' request for a preliminary injunction.

I

On September 7, 2021, Senator Warren sent a letter to Amazon's Chief Executive Officer raising concerns over the company's promotion of books that contain false or misleading information about COVID-19 and the vaccines designed to immunize against it. Her letter began:

> I write regarding concerns that Amazon is peddling misinformation about COVID-19 vaccines and treatments through its search and "Best Seller" algorithms. This is the second time in six months that I have identified Amazon practices that mislead consumers about COVID-19 prevention or treatment: earlier this year, I wrote regarding concerns that the company is providing consumers with false and misleading

information about FDA-authorized KN95
masks.      This pattern and practice of
misbehavior suggests that Amazon is either
unwilling or unable to modify its business
practices to prevent the spread of falsehoods
or the sale of inappropriate products—an
unethical, unacceptable, and potentially
unlawful course of action from one of the
nation's largest retailers.

(Footnote    omitted.)     After    detailing    the    virus's
disproportionate impact on the unvaccinated population,
Senator Warren claimed that "[c]onspiracy theories about
COVID-19 abound" and "have led to untold illnesses and
deaths."   These conspiracy theories, she wrote, are "often
facilitated by technology companies that refuse to curb
misinformation." She explained that when her staff searched
for pandemic-related terms on Amazon's platform, the top
results included "books based on falsehoods about COVID-
19 vaccines and cures."

One of these books was *The Truth About COVID-19*,
which the letter alleged "perpetuates dangerous conspiracies
about COVID-19" by disputing the safety and efficacy of
vaccines while promoting alternative treatments with limited
scientific basis.  Senator Warren explained that the Food and
Drug Administration (FDA) had instructed one of the book's
authors, Dr. Joseph Mercola, to stop selling these ineffective
and unauthorized treatments on his website.  She also noted
that Dr. Mercola had been the subject of multiple federal
investigations, including a false-advertising investigation
that led to a $2.95 million consumer settlement.  Based on
these concerns, Senator Warren expressed alarm that *The
Truth About COVID-19* appeared as a "Best Seller" on

Amazon and as the "#1 Best Seller" in the company's "Political Freedom" category.

Senator Warren credited Amazon for not officially sponsoring these search results, unlike its prior sponsorship of unauthorized KN95 masks. Nevertheless, she insisted that Amazon should do more to stop the spread of false or misleading COVID-19 information. She noted that other technology companies had implemented processes for removing misleading posts about the virus and that Amazon had been more proactive in taking down other forms of misinformation. The letter concluded by asking Amazon to "perform an immediate review of [its] algorithms and, within 14 days, provide both a public report on the extent to which Amazon's algorithms are directing consumers to books and other products containing COVID-19 misinformation and a plan to modify these algorithms so that they no longer do so." Senator Warren also asked Amazon to answer four specific questions about its search algorithms and its use of the "Best Seller" label so that she could "fully understand Amazon's role in facilitating misinformation about COVID-19 and its actions to address the issue."

The following day, Senator Warren issued a press release on her website in which she attached the letter just described. *See* Senator Elizabeth Warren, Press Release, Warren Investigation Finds Amazon Provides Consumers with COVID-19 Vaccine Misinformation in Search Results (Sept. 8, 2021), https://www.warren.senate.gov/oversight/letters/w arren-investigation-finds-amazon-provides-consumers-with -covid-19-vaccine-misinformation-in-search-results.

Two months later, the plaintiffs sued Senator Warren, alleging that her letter violated their First Amendment rights by attempting to intimidate Amazon and other booksellers

into suppressing their publication.   They sought a preliminary injunction requiring Senator Warren to remove the letter from her website, to issue a public retraction, and to refrain from sending similar letters in the future.  The district court denied the motion, concluding that the plaintiffs had failed to raise a serious First Amendment question and that the equitable considerations did not weigh in their favor.  The plaintiffs have appealed that ruling under 28 U.S.C. § 1292(a)(1).

II

Before addressing the merits of this appeal, we must first determine whether the plaintiffs have standing to seek a preliminary injunction.  The plaintiffs have alleged three injuries stemming from Senator Warren's letter: (1) injuries related to certain booksellers' suppression of their publication; (2) a chilling effect on their speech; and (3) reputational harm.  Because reputational harm provides a sufficient basis for standing, we need not address the other alleged injuries.

Senator Warren's letter disparages *The Truth About COVID-19* by claiming that the book perpetuates dangerous falsehoods that have led to countless deaths.  It also directly impugns the professional integrity of one of the authors, Dr. Mercola.  The plaintiffs have shown that these remarks, which Senator Warren broadcast to the public by posting the letter on her website, damaged their reputations. Reputational harm stemming from an unretracted government action is a sufficiently concrete injury for standing purposes.  *See, e.g.*, *Foretich v. United States*, 351 F.3d 1198, 1212–13 (D.C. Cir. 2003).  This is true in the First Amendment context even though reputational injury is not itself a reason to prevent government officials from engaging

in the rough and tumble of political debate.  *See, e.g.*, *Eaton v. Meneley*, 379 F.3d 949, 956 (10th Cir. 2004).

The requested preliminary injunction would likely redress the plaintiffs' reputational injuries in two ways. First, an injunction requiring Senator Warren to take down the letter from her website would likely limit its reach and thereby mitigate the damage.  To be sure, the injunction would not prevent Senator Warren from criticizing the book or its authors in other ways.  But an injunction does not need to prohibit all forms of criticism to provide effective relief. It is enough for standing purposes that an injunction could enjoin the particular form of disparagement at issue here. *See Foretich*, 351 F.3d at 1214–15 (citing *Meese v. Keene*, 481 U.S. 465, 477 (1987)); *Turkish Coalition of America, Inc. v. Bruininks*, 678 F.3d 617, 622–23 (8th Cir. 2012). Second, the plaintiffs contend that Senator Warren's letter accused them, and all those who facilitate the sale of their book, of engaging in "potentially unlawful" conduct.  For reasons explained below, we are unsure that the letter contains such an implication.  But to the extent any reader of the letter might come away with this impression, the requested injunction would remove the unique stigma associated with having a government official label someone a law breaker and thereby cast a shadow over their activities and affiliates.  *See Keene*, 481 U.S. at 476–77; *Parsons v. U.S. Department of Justice*, 801 F.3d 701, 705–06, 712 (6th Cir. 2015).

Based on their reputational harm, the plaintiffs have met their burden of showing an injury that Senator Warren caused and that could be remedied by the requested relief. *See LA Alliance for Human Rights v. County of Los Angeles*, 14 F.4th 947, 956–57 (9th Cir. 2021).  We can now proceed to the merits of their appeal.

III

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). A plaintiff alternatively can meet his burden under the first element by raising "serious questions going to the merits" if "the balance of hardships tips sharply in [his] favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Because the plaintiffs here do not raise a serious question on the merits of their First Amendment claim, the district court did not abuse its discretion by denying a preliminary injunction. *See Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217, 1223 (9th Cir. 2017).

The crux of the plaintiffs' case is that Senator Warren engaged in conduct prohibited under the Supreme Court's decision in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), by attempting to coerce Amazon into stifling their protected speech. In *Bantam Books*, the Rhode Island legislature had created an entity called the Rhode Island Commission to Encourage Morality as a means of stopping the distribution of indecent material to children. *Id.* at 59. Pursuant to its mandate, the Commission sent letters to distributors notifying them that it had sent the police a list of inappropriate books and magazines (many of which were not obscene) and requesting that distributors remove these publications from circulation. *Id.* at 64. The notices thanked distributors for their "anticipated cooperation" because it would "eliminate the necessity of our recommending prosecution to the Attorney General's department." *Id.* at 62

& n.5.  Police then followed up with distributors to ensure that they had complied with the notices.  *Id.* at 68.  The Court held that this "system of informal censorship," which was "clearly [designed] to intimidate" distributors into removing disfavored publications from the shelves, violated the First Amendment.  *Id.* at 64, 71.

Following *Bantam Books*, lower courts have drawn a sharp line between government officials' "attempts to convince and attempts to coerce" intermediaries not to distribute a third party's speech.  *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam).  Under those decisions, an attempt to persuade is permissible government speech, while an attempt to coerce is unlawful government censorship.  For example, in *Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*, 827 F.2d 1291 (9th Cir. 1987), we held that a deputy county attorney violated the First Amendment by threatening to prosecute a telephone company if it continued to carry a salacious dial-a-message service.  *Id.* at 1296.  By contrast, in *American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114 (9th Cir. 2002), we held that San Francisco officials did not violate the First Amendment when they criticized religious groups' anti-gay advertisements and urged television stations not to broadcast the ads.  *Id.* at 1119–20, 1125.  In doing so, we articulated the rule that "public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction."  *Id.* at 1125.

Although the line between persuasion and coercion is clear in theory, it can sometimes be difficult to distinguish between the two in practice.  To assist in drawing that distinction, the Second Circuit has formulated a useful non-

exclusive four-factor framework that examines: (1) the government official's word choice and tone; (2) whether the official has regulatory authority over the conduct at issue; (3) whether the recipient perceived the message as a threat; and (4) whether the communication refers to any adverse consequences if the recipient refuses to comply. *National Rifle Association of America v. Vullo*, 49 F.4th 700, 715 (2d Cir. 2022). Applying this framework in light of our case law, we agree with the district court that Senator Warren's letter does not cross the constitutional line between persuasion and coercion.

*Word choice and tone.* Senator Warren's letter denounces *The Truth About COVID-19* and chastises Amazon for "peddling misinformation about COVID-19 vaccines and treatments," conduct that she contends has led to countless illnesses and deaths. These are strong words, to be sure. But our system of government requires that elected officials be able to express their views and rally support for their positions. *See Bond v. Floyd*, 385 U.S. 116, 135–36 (1966). As our decision in *American Family* shows, this principle includes allowing politicians to forcefully criticize other speakers and the platforms that carry their messages. 277 F.3d at 1125.

Senator Warren used strong rhetoric—along with her references to peer companies' efforts to limit false and misleading information about COVID-19—in her attempt to convince Amazon to be more proactive in suppressing misinformation. In case Amazon remained unconvinced by her argument, she posted the letter online for all to read. The letter's widespread dissemination may have put pressure on Amazon to act, but not in a way that *Bantam Books* prohibits. *See R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 89 (3d Cir. 1984). Generating public pressure to motivate

others to change their behavior is a core part of public discourse, and "[w]e are aware of no constitutional right . . . [that] require[s] legislators to refrain from such speech or advocacy." *X-Men Security, Inc. v. Pataki*, 196 F.3d 56, 68 (2d Cir. 1999). In fact, any such right "would stand the Constitution on its head" by cutting off political discourse. *Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 35 (2d Cir. 1983).

Senator Warren's letter concluded by "ask[ing] that [Amazon] perform an immediate review of [its] algorithms" and issue a public report detailing its plans to modify the company's practices regarding COVID-19 misinformation. This request was direct, but it was still framed as a request rather than a command and is thus distinguishable from the communications at issue in *Bantam Books*.  There, the Supreme Court recognized the reality that some "requests" cannot really be refused when it noted that "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." *Bantam Books*, 372 U.S. at 68.  Yet unlike the notices in that case, which were "phrased virtually as orders" and enforced by police and prosecutors, nothing in Senator Warren's call to action directly suggests that compliance was the only realistic option to avoid government sanction. *Id.*

The plaintiffs agree with much of this analysis but insist that two words in the letter's opening paragraph change everything—namely, Senator Warren's suggestion that Amazon was engaging in "potentially unlawful" conduct. With these two words, the plaintiffs contend, Senator Warren crossed the line between persuasion and coercion by insinuating that Amazon's promotion of *The Truth About COVID-19* could expose the company to legal liability. For

the reasons stated below, we do not think this is a plausible interpretation of the letter.

We must read the phrase "potentially unlawful" in context, not in isolation. Senator Warren's letter began by noting that this was the second time she had written to Amazon in recent months. Her prior correspondence, she explained, expressed concern that the company was providing consumers with false or misleading information about unauthorized KN95 masks. In the next sentence, she wrote that "[t]his pattern and practice of misbehavior suggests that Amazon is either unwilling or unable to modify its business practices to prevent the spread of falsehoods or the sale of inappropriate products—an unethical, unacceptable, and *potentially unlawful* course of action from one of the nation's largest retailers." (Emphasis added.) Placed in proper perspective, the phrase "potentially unlawful" most likely refers to the "sale of inappropriate products," such as the unauthorized KN95 masks. Such a business practice could potentially constitute unlawful consumer fraud. By contrast, the letter does not explain which law Amazon might be violating by selling *The Truth About COVID-19* or any other book.

Even if we accept the plaintiffs' reading of the letter, however, referencing potential legal liability does not morph an effort to persuade into an attempt to coerce. *See VDARE Foundation v. City of Colorado Springs*, 11 F.4th 1151, 1165 (10th Cir. 2021). The relevant question remains whether the communication can reasonably be construed as coercive, and not every official's legal opinion reasonably resembles a threat. *See Bantam Books*, 372 U.S. at 68–69 (distinguishing between "mere legal advice" and an actual threat of legal action). For example, it would not be coercive for a government official to point out that a company's conduct

could be the basis of a consumer class action.  Nor would it be coercive to warn a company that its practices could spur other government officials to consider legal action.  A First Amendment problem arises only if the official intimates that she will use her authority to turn the government's coercive power against the target if it does not change its ways.  *See Zieper v. Metzinger*, 474 F.3d 60, 66 (2d Cir. 2007).  Neither the "potentially unlawful" language nor the letter's reference to past FDA investigations into Dr. Mercola's commercial enterprises suggests that Senator Warren planned to punish Amazon if it continued to promote the plaintiffs' book.

The absence of a clear allegation of legal violations or threat of specific enforcement actions distinguishes this case from *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), on which the plaintiffs heavily rely.  In *Backpage.com*, Cook County Sheriff Thomas Dart sent a letter demanding that Mastercard and Visa "cease and desist" allowing their customers to use their credit cards on Backpage's website, which contained an adult classified advertisements section.  *Id.* at 231.  The letter claimed that the website was integral to sex trafficking and reminded the companies that they have a "legal duty to [report] . . . to authorities in cases of human trafficking and sexual exploitation of minors."  *Id.* at 232.  In support of this point, Sheriff Dart cited the federal money-laundering statute, 18 U.S.C. § 1956.  *Backpage.com*, 807 F.3d at 232.  The Seventh Circuit held that this letter—which the sheriff's department described as a "demand" and which explicitly invoked Sheriff Dart's position in law enforcement—offered more than legal advice and instead threatened criminal sanctions if the credit card companies did not sever ties with the website.  *Id.* at 231–33.  We see no similar legal intimidation in our case.

Finally, a full review requires us to analyze not only the tone of the letter but also the tenor of the overall interaction between Senator Warren and Amazon. An interaction will tend to be more threatening if the official refuses to take "no" for an answer and pesters the recipient until it succumbs. In *Bantam Books*, for instance, the Commission sent repeated notices and followed up with police visits. 372 U.S. at 62–63; *see also Zieper*, 474 F.3d at 66–67. Here, the record contains no evidence that Senator Warren followed up on her letter in any fashion, even though Amazon continued to sell *The Truth About COVID-19* on its platform.

The words on the page and the tone of the interaction thus suggest that the letter was intended and received as nothing more than an attempt to persuade.

*Regulatory authority*. The second consideration is whether the government official has regulatory authority over the recipient in the relevant policy area. Although the lack of direct authority is "not necessarily dispositive," it is "certainly relevant" for determining whether a message is an act of persuasion or a threat of adverse consequences. *Okwedy*, 333 F.3d at 343–44. This factor weighs against finding impermissible coercion here.

Elizabeth Warren, as a single Senator, has no unilateral power to penalize Amazon for promoting *The Truth About COVID-19*. This absence of authority influences how a reasonable person would read her letter. A similar letter might be inherently coercive if sent by a prosecutor with the power to bring charges against the recipient, *see Carlin*, 827 F.2d at 1296, or if sent by some other law enforcement officer, *see Backpage.com*, 807 F.3d at 233 (speculating that a letter sent by someone outside of law enforcement "would be more likely to be discarded or filed away than to be acted

on"). The letter could be viewed as more threatening if it were penned by an executive official with unilateral power that could be wielded in an unfair way if the recipient did not acquiesce. *See Okwedy*, 333 F.3d at 342. But as one member of a legislature who is removed from the relevant levers of power, Senator Warren would more naturally be viewed as relying on her persuasive authority rather than on the coercive power of the government to take action against Amazon.

Senator Warren's lack of unilateral regulatory authority distinguishes this case from *Bantam Books*. Although the Commission in *Bantam Books* lacked prosecutorial power, the Supreme Court held that the "want of power to apply formal legal sanctions" was immaterial because the state legislature had vested the Commission with the authority to ban books, investigate violations, and recommend prosecutions. 372 U.S. at 66. A letter from a single Senator backed by no statutory mandate is far afield from this system of "effective state regulation." *Id.* at 69. Whereas it would have been foolish for the distributors in Rhode Island to ignore the Commission's official notices, *id.* at 68, it would have been unreasonable here for Amazon to believe that a single member of Congress could bring to bear coercive government power against it for promoting books on its platform.[1]

---

[1] In response, the plaintiffs contend that Senator Warren is differently situated from other members of Congress because she has a track record of targeting Amazon, especially in relation to alleged antitrust violations. We fail to see how these acts, which Senator Warren performed as a member of the Senate Finance Committee, make it any more likely that she could cajole the relevant authorities to punish Amazon if it did not limit the spread of COVID-19 misinformation.

*Perception of the recipient.*  The third factor focuses on how the recipient understood the communication.  We do not require an intermediary to admit that it bowed to government pressure for the plaintiff to state a First Amendment claim. *See Backpage.com*, 807 F.3d at 233.  After all, the recipient may wish to conceal why it agreed to the official's request. Indeed, it is not even necessary for the recipient to have complied with the official's request because a credible threat may violate the First Amendment even if "the victim ignores it, and the threatener folds his tent."  *Id.* at 231.  But on the margins, we are more likely to find impermissible coercion if there is some indication that the recipient of the message understood it as a threat. *See Rattner v. Netburn,* 930 F.2d 204, 210 (2d Cir. 1991).

With respect to Amazon, there is no evidence that the company changed its algorithms in response to Senator Warren's letter, let alone that it felt compelled to do so. The plaintiffs point to the fact that, several weeks after receiving the letter, Amazon notified Chelsea Green Publishing that it would not advertise *The Truth About COVID-19* even though it had promoted other Chelsea Green books in the past.  This fact is unilluminating because no evidence suggests that Amazon ever advertised the plaintiffs' book before receiving the letter.  Absent such evidence, it is far more likely that Amazon's decision not to advertise the plaintiffs' book was a response to widespread concerns about the spread of COVID-19 misinformation rather than a response to Senator Warren's letter. *See Association of American Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028, 1034–35 (D.C. Cir. 2022).  And even if Senator Warren's letter did prompt Amazon's refusal, the decision still more plausibly reflected the company's concern over

reputational risks in the court of public opinion rather than fears of liability in a court of law.

Beyond Amazon, the plaintiffs point out that Barnes & Noble removed *The Truth About COVID-19* from its online platform one day after Senator Warren posted the letter on her website.  Even assuming that the letter caused this change in policy, it is unlikely that the letter did so by way of coercion.  Senator Warren sent the letter to Amazon, and the letter criticizes Amazon's algorithms and its use of the "Best Seller" label.  We doubt that Barnes & Noble officials would have read these critiques of another company's business practices and felt compelled to respond by pulling a book from its own digital shelves—an action that Senator Warren had not even requested of Amazon.  Again, it is more likely that Barnes & Noble reassessed its policies either because it was persuaded by Senator Warren's critique or, alternatively, because it feared the letter might spark a public backlash that would spread beyond Amazon.  Either of these effects is consistent with an elected official's permissible attempts to shape public discourse and change market practices.

*Adverse consequences for non-compliance.*  The final and perhaps most important consideration for distinguishing between permissible persuasion and impermissible coercion is whether the official's communication refers to adverse consequences that will follow if the recipient does not accede to the request.  *See Vullo*, 49 F.4th at 715.  Senator Warren's silence on adverse consequences supports the view that she sought to pressure Amazon by calling attention to an important issue and mobilizing public sentiment, not by leveling threats.

The most obvious cases of coercion occur when an official explicitly refers to adverse consequences. In *Carlin*, the deputy county attorney's direct threat of prosecution made clear that the letter was no mere act of persuasion. 827 F.2d at 1296. Although not as explicit, the Commission's notices in *Bantam Books* included "thinly veiled threats to institute criminal proceedings" by warning that the Commission would recommend prosecution if the distributors did not pull the targeted publications. 372 U.S. at 68. Senator Warren's letter, by contrast, contains no explicit reference to any repercussions Amazon would suffer if it refused her request.

To be sure, an official does not need to say "or else" if a threat is clear from the context. In *Backpage.com*, for instance, the Seventh Circuit held that, although Sheriff Dart's letter did not outright say that he thought the credit card companies were accomplices to a crime, he had implied as much by citing the federal money-laundering statute in his demand letter. 807 F.3d at 234. Going a step further, Sheriff Dart had "contacted the Inspector General of the United States Postal Service and the FBI, urging them to investigate the lawfulness of alternative payment methods for Backpage's sex ads." *Id.* at 237. These actions left little doubt as to what Sheriff Dart would do if the credit card companies did not sever ties with the website.

Here, by contrast, it is hard to fathom what the unspoken "or else" would be. The plaintiffs argue that Amazon could reasonably have construed the letter as implying that Senator Warren could refer Amazon for criminal prosecution as an accomplice to homicide (or perhaps some lesser crime). We agree with the district court that this interpretation "requires a vivid imagination." A vast gap exists between implying that an entity is morally complicit in causing deaths and

accusing it of being an accomplice to homicide. Our court recognized this critical difference in *American Family*. The Board of Supervisors' letter in that case claimed that the groups' hateful rhetoric had a "direct correlation" with "horrible crimes committed against gays and lesbians." 277 F.3d at 1119. In particular, the letter stated that Matthew Shepard's brutal murder by anti-gay assailants was "in part due to the message being espoused by your groups." *Id.* We did not read this as threatening criminal prosecution against these groups. Rather, we held that the letter was a powerful and permissible form of denunciation. The same is true here.

To distinguish *American Family*, the plaintiffs again insist that the words "potentially unlawful" make all the difference. Once more, we disagree. These words appear in a different paragraph from the reference to "untold illness and death," and Senator Warren never linked the two concepts together.  Although we must read the letter holistically, we may not distort the text by melding together pieces that do not fit.  Regardless, as discussed above, Senator Warren never hinted that she would take specific action to investigate or prosecute Amazon based on a far-fetched legal theory that Amazon's book sales made it liable for COVID-19 deaths or complicit in some unspecified other offense.

\*          \*          \*

We conclude that the plaintiffs have not raised a serious question as to whether Senator Warren's letter constituted an unlawful threat in violation of the First Amendment.  Her letter requested, but did not demand, that Amazon reevaluate its business practices regarding COVID-19 misinformation and report back any changes.  The absence of a specific demand is unsurprising given that Senator Warren lacks

direct regulatory authority over Amazon in this matter. There is no evidence that Amazon or any other bookseller perceived the letter as a threat, and the "potentially unlawful" language does not fundamentally alter the analysis because Senator Warren never stated or otherwise implied that there would be any adverse consequences if Amazon failed to comply with her request.  As a result, we hold that the district court did not abuse its discretion in denying the plaintiffs' request for a preliminary injunction.

   **AFFIRMED.**

BENNETT, Circuit Judge, concurring:

   The question before us is narrow: whether the district court abused its discretion in denying a preliminary injunction.  I concur in the judgment because the district court did not misapply the law, clearly misconstrue the record, or otherwise abuse its discretion in determining that plaintiffs are unlikely to succeed on the merits of their First Amendment claim.[1] *See Fed. Trade Comm'n v. Consumer Def., LLC*, 926 F.3d 1208, 1211–12 (9th Cir. 2019).  But the majority proceeds to hold that plaintiffs failed even to raise a "serious question" going to the merits regarding Senator

---

[1] The Supreme Court has emphasized that "[a] preliminary injunction is an extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "Our review of a decision regarding a preliminary injunction is limited and deferential . . . . [O]ur inquiry is at an end once we determine that the district court employed the appropriate legal standards . . ., and correctly apprehended the law with respect to the underlying issues in litigation." *Harris v. Bd. of Supervisors, L.A. County*, 366 F.3d 754, 760 (9th Cir. 2004) (cleaned up).

Warren's letter. Op. at 22. I write separately to express my view that some aspects of the letter could be interpreted as coercive by a reasonable reader.

Applying the four non-exclusive factors relied upon by the majority, plaintiffs have plausibly alleged that some portions of the letter could be read as coercive. Op. at 12 – 13 (citing *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 715 (2d Cir. 2022)). For example, although I agree with the majority that Senator Warren's choice of the phrase "potentially unlawful" is ambiguous in context, it could plausibly be read as referring to a broader "pattern and practice of misbehavior" that the Senator identified, including the use of algorithms to promote *The Truth About COVID-19*. Second, although a single Senator lacks unilateral authority to impose direct government sanctions on Amazon or other retailers, it is possible that Senator Warren could have made a criminal referral to the Department of Justice, advocated for Committee hearings and investigative subpoenas targeting Amazon's conduct, or introduced legislation to retaliate against a lack of compliance.[2]

Against this backdrop, a reader could interpret the letter as implicitly threatening adverse action if Amazon did not comply with the Senator's request. Indeed, the letter:

---

[2] At the time Senator Warren sent the letter, she was a member of the Senate majority and served on the Subcommittee on Financial Institutions and Consumer Protection, which exercises jurisdiction over E-commerce activities. *Subcommittees*, United States Senate Committee on Banking, Housing, and Urban Affairs, https://www.banking.senate.g ov/about/subcommittees#financial-institutions-and-consumer-protection (last visited Apr. 21, 2023).

> ask[ed] that [Amazon] perform an immediate
> review of Amazon's algorithms and, within
> 14 days, provide both a public report on the
> extent to which Amazon's algorithms are
> directing consumers to books and other
> products containing COVID-19 misinformation
> and a plan to modify these algorithms so that
> they no longer do so.

Senator Warren closed by asking Amazon to answer four
specific questions about the impact of its policies and
algorithms on the spread of misinformation. Although the
letter does not threaten specific consequences if Amazon
failed to comply with this request; as the majority notes, we
do not require a government official to list specific
consequences in order to find a constitutional violation. Op.
at 21. As in *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir.
2003), where a veiled reference to "economic benefits"
enjoyed by billboard owners was enough to constitute a
coercive threat, *id.* at 342–44, Senator Warren's request for
an "immediate" and "public" response could be read as
implying adverse action if Amazon failed to comply. Thus,
I believe plaintiffs have raised at least some questions as to
the potentially coercive nature of Senator Warren's letter.

   Nonetheless, the district court correctly determined that
these coercive elements were not sufficient to demonstrate
the "likelihood of success on the merits" necessary for a
preliminary injunction. Considering the totality of the
circumstances, the letter did not accuse Amazon of specific
unlawful conduct related to selling *The Truth About COVID-
19* or other books. Moreover, Senator Warren lacked the
authority to unilaterally impose direct sanctions to the extent
her letter implied a threat of retaliation. The district court's

conclusion that "[p]laintiffs are unlikely to successfully demonstrate that the booksellers reasonably perceived Defendant Warren's letter as a threat" is supported by the record and relevant caselaw.  But I would stop short of the majority's conclusion that plaintiffs have not raised serious questions about the coercive nature of the letter. Accordingly, I concur in the result.